No. 82–952.   MARYLAND ET AL. *v.* UNITED STATES ET AL.;
No. 82–953.   TANDY CORP. *v.* UNITED STATES ET AL.;
No. 82–992.   NORTH AMERICAN TELEPHONE ASSN. *v.*
UNITED STATES ET AL.; and

No. 82–1001.   ILLINOIS *v.* UNITED STATES ET AL.   Affirmed on appeals from D. C. D. C.   Reported below: 552 F. Supp. 131.

JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE and JUSTICE WHITE join, dissenting.

These consolidated cases raise questions concerning the settlement of a civil antitrust suit brought by the United States against American Telephone & Telegraph Co. (AT&T).   In January 1982, the parties announced a settlement in the form of a consent decree.   The proposed settlement was filed in the District Court for the District of Columbia, which ordered the start of procedures provided for in § 2 of the Antitrust Procedures and Penalties Act, 88 Stat. 1706, 15 U. S. C. § 16(b) *et seq.* (Act).

The Act provides:

> "Before entering any consent judgment proposed by the United States under this section, the court shall determine that the entry of such judgment is in the public interest."   15 U. S. C. § 16(e).

The District Court issued a lengthy opinion discussing the proposed decree.   552 F. Supp. 131 (1982).   It found that most of the decree's provisions were in the public interest, but stated that it would not approve the decree unless the parties agreed to several changes.   The parties acquiesced,

and the District Court then approved and entered the amended decree and a final judgment dismissing the case.

The District Court allowed appellants to intervene for purposes of appealing the final judgment and certified their appeals for immediate consideration by this Court under the Expediting Act, 15 U. S. C. § 29(b).

In Nos. 82–952 and 82–1001, several States contend that the decree improperly pre-empts state regulation of the telephone industry. They contend their regulation of the industry is "state action" which is exempt from the Sherman Act under *Parker* v. *Brown*, 317 U. S. 341 (1943). Thus they do not appear to challenge the conclusion that this consent decree is in the public interest; they claim that the District Court lacked the authority to override state law by entering this consent decree.

The District Court reasoned that "[s]ince the conduct which is the subject of these lawsuits is . . . well within the jurisdiction of the federal antitrust laws . . . it would make no sense to hold that, in providing a remedy for anticompetitive conduct, the Court must refrain from interfering with state regulation," and "[t]he same rationale applies to . . . a consent decree." 552 F. Supp., at 158, and n. 111. I am troubled by the notion that a district court, by entering what is in essence a private agreement between parties to a lawsuit, invokes the Supremacy Clause powers of the Federal Government to pre-empt state regulatory laws. The District Court may well be correct, but I am not prepared to create a precedent in this Court by summarily affirming its decision. This is particularly true when it is not at all clear whether the summary affirmance disposes of the merits of the States' contentions.

In No. 82–953, a competitor of AT&T argues that the District Court should not have eliminated a requirement that Western Electric license its patents for a reasonable royalty to anyone who applies. It also contends that AT&T should not have been permitted to sell telephones through its Phone

Center Stores because competitors, especially local telephone companies, will not be able to compete effectively. In No. 82–992, by contrast, an association of telephone manufacturers, does not object to permitting AT&T to sell telephones, but insists that local telephone companies should not be permitted to do so. These appellants *do* challenge the District Court's conclusion that this settlement is in the public interest.

In order to review the determination that a settlement is in the public interest, it is first necessary to know what "the public interest" means. The Act itself is not very helpful. It does state that "the court may *consider*—

"(1) the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration or *[sic]* relief sought, anticipated effects of alternative remedies actually considered, and *any other considerations bearing upon the adequacy of such judgment;*

"(2) the impact of entry of such judgment upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial." 88 Stat. 1707, 15 U. S. C. § 16(e) (emphasis supplied).

The legislative history reveals that the sponsors of the Act were concerned that the Department of Justice had settled some civil antitrust cases on what they believed to have been unfavorable terms. Senator Tunney spoke of several "blatantly inequitable and improper antitrust settlements." 119 Cong. Rec. 24598 (1973). The Act appears to have been intended to prevent the Department of Justice from settling civil antitrust cases on terms less favorable than Congress thought it should obtain.

Faced with this paucity of guidance, the District Court undertook to "defin[e] the public interest in accordance with the antitrust laws." 552 F. Supp., at 149. It noted that, be-

cause it was dealing with a settlement, it "is not as free to exercise its discretion in fashioning a remedy as it would be upon a finding of liability." *Id.*, at 151. It thought it should approve the settlement "even if it falls short of the remedy the court would impose on its own, as long as it falls within the range of acceptability or is 'within the reaches of public interest.'" *Ibid.*, quoting *United States* v. *Gillette Co.*, 406 F. Supp. 713, 716 (Mass. 1975). The District Court summarized the proper standard as follows:

> "After giving due weight to the decisions of the parties as expressed in the proposed decree, the Court will attempt to harmonize competitive values with other legitimate public interest factors. If the decree meets the requirements for an antitrust remedy—that is, if it effectively opens the relevant markets to competition and prevents the recurrence of anticompetitive activity, all without imposing undue and unnecessary burdens upon other aspects of the public interest—it will be approved." 552 F. Supp., at 153 (footnote omitted).

It is not clear to me that this standard, or any other standard the District Court could have devised, admits of resolution by a court exercising the judicial power established by Art. III of the Constitution. The Act applies only when a case has been settled. Thus, by definition, there has been no judicial finding of relevant markets, closed or otherwise, to be opened or of anticompetitive activity to be prevented. The District Court seems to have assumed first that there was an antitrust violation and second that it knew the scope and effects of the violation. But the parties have settled the case and thereby avoided the necessity for such findings.

Even if this problem could be put aside, the case remains problematic at best. Representative Hutchinson, who was a member of the House Committee that considered the Act, stated on the House floor that it

"imposes on the courts what is essentially a nonjudicial function. In short, the courts will have to decide whether the Department of Justice has exercised its prosecutorial discretion to settle antitrust cases as well as it should. . . . In my opinion, such a process is foreign to the judicial function." 120 Cong. Rec. 36340 (1974).

In an addendum to the Committee Report, Representative Hutchinson stated that the defect of the Act

"is simply that to require federal courts to determine whether a consent decree is in the public interest is to transfer an 'executive' question to the courts for resolution. The question for the court will be whether the Department of Justice has exercised its prosecutorial discretion well or, perhaps, as well as possible. The question will *not* be whether the Department has violated some legal standard. For none is established by this legislation. Rather, the court is given a plenary and unqualified authority to re-decide an executive decision." H. R. Rep. No. 93–1463, p. 21 (1974) (Additional Views of Mr. Hutchinson) (emphasis in original).

I believe this point is well taken. The question assigned to the district courts by the Act is a classic example of a question committed to the Executive. "The province of the court is, solely, to decide on the rights of individuals, not to inquire how the executive, or executive officers, perform duties in which they have a discretion." *Marbury* v. *Madison*, 1 Cranch 137, 170 (1803). In *Baker* v. *Carr*, 369 U. S. 186, 217 (1962), the Court listed six alternative ways of identifying a political question that is beyond the competence of the Judiciary. Three of these apply to these cases: "a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for discovering it; or

the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion." *Ibid.*

The question whether to prosecute a lawsuit is a question of the execution of the laws, which is committed to the Executive by Art. II. There is no standard by which the benefits to the public from a "better" settlement of a lawsuit than the Justice Department has negotiated can be balanced against the risk of an adverse decision, the need for a speedy resolution of the case, the benefits obtained in the settlement, and the availablility of the Department's resources for other cases. How is a court to decide whether a better settlement in a case involving one industry is more important to the public than the benefits that might be gained by immediately working on an antitrust problem in another industry? Finally, the decision requires an evaluation of an initial policy decision—whether the benefits that might be obtained in a lawsuit are worth the risks and costs—that is clearly for nonjudicial discretion.

In short, the language of the Court in *Green* v. *Frazier,* 253 U. S. 233, 240 (1920), seems fully applicable here: "Questions of policy are not submitted to judicial determination, and the courts have no general authority of supervision over the exercise of discretion which under our system is reposed in the people or other branches of government." Even though Congress may by statute impose such a duty on the federal courts, they may not perform it. *Muskrat* v. *United States,* 219 U. S. 346 (1911).

Because I am concerned about the implications of the Court's decision in Nos. 82–952 and 82–1001, and because it is not clear to me whether the determination sought to be reviewed in Nos. 82–953 and 82–992 is within the judicial power, I would set these appeals for oral argument and postpone the further consideration of the question of jurisdiction to the hearing of the case on the merits.